## TRACY PETROCELLI, Appellant, v. THE STATE OF NEVADA, Respondent.

### No. 14468

January 4, 1985                                    692 P.2d 503

[Rehearing denied March 19, 1985]

*David G. Parraguirre,* Public Defender, *Jane G. McKenna,* Deputy Public Defender, Washoe County, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Mills Lane,* District Attorney, *Gary H. Hatlestad,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

By the Court, STEFFEN, J.:

A jury convicted appellant Tracy Petrocelli of first degree murder and sentenced him to death. Our review of the record convinces us that Petrocelli was fairly tried, convicted and sentenced. We therefore affirm.

Tracy Petrocelli's journey to Reno began in Washington where he killed his fiancee. He fled Washington and apparently drove to Colorado in a Corvette, to Oklahoma in a van and to Reno in a Datsun which he stole while "test driving" the vehicle. Upon arriving in Reno, Petrocelli decided he needed a four-wheel drive truck to get around in the snow. The next day, his search for a vehicle ultimately led to a local used car dealer. The dealer, James Wilson, acceded to Petrocelli's request for a test drive of a Volkswagen (VW) pickup, and the two drove off with the dealer at the wheel. At about 1:30 p.m., a Dodge dealer saw them driving north on Kietzke Lane. Approximately forty-five minutes later, a Reno patrolman saw one person driving a truck matching the description of the VW speeding toward Pyramid Lake.

That evening, Petrocelli was picked up on the Pyramid Highway and given a ride to Sutcliffe. He told the driver that his motorcycle had broken down. In Sutcliffe, Petrocelli got a ride to Sparks with a local game warden. Petrocelli then took a cab to Reno and apparently paid his fare from a two-inch roll of bills.

The next day, the game warden and his partner looked for Petrocelli's motorcycle. Instead, they found the VW truck with bloodstains and bullet holes on the passenger side. The car dealer's body was found later that day in a crevice, covered with rocks, sagebrush and shrubbery. His back pockets were turned slightly inside out and empty; his wallet was missing. The victim, who usually carried large amounts of cash with him, had been shot three times with a .22 caliber weapon. One shot was to the neck; another shot was to the heart, the third shot was to the back of the head from a distance of two to three inches.

In the abandoned truck, .22 caliber bullet casings were found. When he was arrested, Petrocelli was carrying a .22 caliber semi-

automatic pistol which he testified he always carried loaded and ready to fire. Ballistics tests on the casings found in the abandoned VW revealed that they had been fired from Petrocelli's pistol. Tests on the bullet found in Wilson's chest and a test bullet fired from Petrocelli's pistol also revealed similar markings.

At trial, Petrocelli provided his own account of the killing. After driving off the car lot, the car dealer stopped at a gas station and filled the truck. From the station, Petrocelli drove the truck. He and Wilson proceeded to argue about the price of the truck. Petrocelli laid $3,500.00 on the dashboard and offered a total of $5,000.00 cash. The car dealer was insulted and called him a "punk." Later, on the way back, Wilson twice grabbed for the steering wheel. Petrocelli then pulled out his pistol and said: "Now who is the punk." The victim laughed and said he had a gun also, although Petrocelli never saw one. The car dealer tried to take the pistol from Petrocelli as he continued to drive. As they struggled, the gun went off two or three times. Petrocelli testified, "I knew it was shooting, and I was just trying to pull it away from him. . . . It was an accident. It was an accident. I didn't do anything. I just tried to keep him from getting the gun." Petrocelli drove to a nearby doctor's office, went up to the door, but did not go in because he "didn't know how to tell him [doctor] there was someone hurt, shot in the car." Thereafter, Petrocelli went to a bowling alley and called the hospital, but "didn't know what to say." He then returned to the truck, drove to Pyramid Lake and hid the car dealer's body under some rocks. Petrocelli began walking after his truck bogged down, but then returned to the vehicle to retrieve his gloves and the gun. He also picked up the car dealer's wallet, took his money, threw the business and credit cards into the wind, and discarded the wallet. Petrocelli then walked to the highway where he obtained rides back to Reno.

Petrocelli was convicted by a jury of first degree murder and robbery with the use of a deadly weapon. The sentence for the murder conviction was set at death. Petrocelli now appeals the judgment of conviction of first degree murder and imposition of the death penalty.

The first issue on appeal is whether the district court committed reversible error by attempting to clarify the concept of reasonable doubt for the jury during *voir dire*. NRS 175.211 defines reasonable doubt and provides that no other definition should be given to juries.[1] The trial judge twice read the statutory definition

---

[1]NRS 175.211 provides:

*175.211 Reasonable doubt defined; no other definition to be given to juries.*

1. A reasonable doubt is one based on reason. It is not mere possible

to the jury, once at *voir dire* and once during the formal reading of instructions. After the *voir dire* reading, however, the judge explained reasonable doubt further, including an example referring to ninety-seven yards of a one hundred-yard football field.[2] Petrocelli, relying on McCullough v. State, 99 Nev. 72, 657 P.2d 1157 (1983), maintains that the "ninety-seven yard line" example represented an attempt to quantify the concept of reasonable doubt, which impermissibly lowered the prosecutor's burden of proof. Contrary to *McCullough*, the district court here properly gave the jury the statutory definition, not one which had been disapproved in prior decisions. Moreover, in *McCullough* we explained: "While an attempt by the trial court to clarify the meaning of reasonable doubt is not by itself reversible error, . . . the question on appeal is whether the court's statements correctly conveyed the concept of reasonable doubt to the jury. . . ." *Id.* at 75, 657 P.2d at 1158 (citations omitted). Although the district court did give a numerical example, it was tempered by an effort to prevent the jury from reducing reasonable doubt to a quantitative proposition. Our review shows that the trial court attempted to impress upon the jury that reasonable doubt means reaching a "subjective state of near certitude," as required by the Supreme Court. Jackson v. Virginia, 443 U.S. 307, 315 (1979). We nevertheless again reiterate our admonition in *McCullough* that district courts refrain from elaborating on the statutory definition of reasonable doubt for purposes of clarification or otherwise. Since we perceive neither advantage to the state nor prejudice to the defendant in the trial court's comments we are constrained to hold that no reversible error occurred in conveying the concept of reasonable doubt to the jury.

---

doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual and substantial, not mere possibility or speculation.

2. No other definition of reasonable doubt shall be given by the court to juries in criminal actions in this state.

[2]The transcript of the district court's explanation of reasonable doubt provides, in pertinent part, as follows:

Now, in a civil case . . . its kind of a 50/50 proposition. But there is no 60/40, 70/30, 90/10 proposition involved in proving a case by a certain amount of evidence in a crime case, because the burden, the standard is beyond a reasonable doubt. I think it is a lot easier to understand than it is to define. Some people say you have got to be convinced, and then others use, sports minded, use a kind of athletic football field, getting to the 97 yard line. There are all kinds of ways to say it, but it is being strongly convinced of the Defendant's guilt, or else he is acquitted.

Second, Petrocelli contends that the district court committed reversible error by admitting testimony relating to the prior killing of his girl friend, Melanie Barber. Procedurally, the state sought to interject the subject of the Barber offense during its cross-examination of Petrocelli. After the state had concluded its case in chief, Petrocelli took the stand and testified that the Wilson shooting was accidental. During a post-arrest statement, Petrocelli had similarly described the Barber shooting as accidental.

In Carlson v. State, 84 Nev. 534, 537, 445 P.2d 157, 159 (1968) we expressed our concern regarding evidence of collateral offenses by stating that:

> [N]o reference shall be made to such collateral offenses unless, during the state's case in chief, such evidence is relevant to prove motive, intent, identity, the absence of mistake or accident, or a common scheme or plan; and then, only if such offense is established by plain, clear and convincing evidence. A necessary corollary is that such evidence may not be received to impeach the defendant, except evidence of a prior felony conviction.

The subject of collateral offenses or prior "bad acts" was later codified under our evidence code as NRS 48.045(2).[3] Although the state made no attempt to admit evidence of the Barber killing during its case in chief, it did seek to raise the subject during the cross-examination of the defendant. The state's purpose in doing so, however, was not to impeach the defendant. Petrocelli interjected the issue of accidental killing by his own testimony. The state sought to prove absence of accident through evidence pertaining to the Barber death which had occurred only five months prior to the instant offense.

We consider first the procedure followed by the district court prior to admitting evidence or allowing questions pertaining to the collateral offense. After Petrocelli's testimony on direct examination, the state appropriately requested the district court's permission to raise the collateral offense issue via a hearing outside the presence of the jury. During the hearing, the state presented its reasons why the collateral offense was admissible under certain exceptions specified by NRS 48.045(2). Thereafter,

---

[3]NRS 48.045(2) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

the state apprised the trial judge of the quantum and quality of its evidence proving that the defendant had committed the prior offense. Finally, the trial judge weighed the probative value of the proffered evidence against its prejudicial effect. The procedure thus described was correct.

Next, we consider whether the district court erred in ruling that evidence of the collateral offense was admissible. In the course of the Barber incident, Petrocelli tried to drag the young woman out of her place of employment; she resisted and they struggled. Petrocelli pulled out the same gun that later killed Wilson and killed her in a flurry of shots. He claimed that her death was also accidental. The evidence clearly was relevant to prove absence of accident, one of the exceptional purposes specified in NRS 48.045(2).

As noted above, before evidence of a prior bad act can be admitted, the state must show, by plain, clear and convincing evidence that the defendant committed the offense. Tucker v. State, 82 Nev. 127, 131, 412 P.2d 970, 972 (1966). The state's offer of proof fulfilled this requirement. Petrocelli's own admission, coupled with eyewitness testimony, established by the requisite standard of proof that Petrocelli killed Melanie Barber. Moreover, the state properly demonstrated the quality of its evidence on the subject by actually calling the eyewitness on rebuttal.

Finally, we perceive no error in the district court's ruling that the probative value of the collateral evidence outweighed its prejudicial effect. The court concluded that the "two killings with the same gun involving the same person, Mr. Petrocelli, who within a short period of time [committed the killings]" bore sufficient similarity to admit the evidence at trial. Admission of the evidence was within the district court's sound discretion, and we will respect the lower court's determination when, as here, it is not "manifestly wrong." Brown v. State, 81 Nev. 397, 400, 404 P.2d 428, 430 (1965).

Petrocelli's third contention is that the jury's consideration of the underlying felony of robbery as an aggravating circumstance constituted reversible error. During the guilt phase of trial, the state pursued conviction upon alternative theories of felony murder and premeditated and deliberate murder. The jury returned a general verdict which did not specify the theory upon which it based its verdict. During the sentencing phase of Petrocelli's trial, the jury concluded that there were two circumstances under

NRS 200.033 which aggravated the conviction of murder and no mitigating circumstances sufficient to outweigh the aggravating circumstances.[4] Petrocelli argues that when an individual is convicted of first degree murder under an alternative felony-murder theory (NRS 200.030), proof of the underlying felony may not be used as an aggravating circumstance without a specific finding that the defendant premeditatedly and deliberately killed the victim. Petrocelli relies on State v. Cherry, 257 S.E.2d 551 (N.C. 1979), in which the North Carolina Supreme Court held that when a defendant is convicted of first degree murder under the felony murder rule, the trial judge shall not submit to the jury at the sentencing phase of trial the aggravating circumstance concerning the underlying felony. *Cherry* was based on the potentially disproportionate treatment of defendants convicted of felony murder and defendants convicted of premeditated and deliberate murder. The North Carolina Supreme Court also based *Cherry* on its adherence to the merger rule, which provides that the underlying felony becomes an element of the crime of felony murder and may not act as the basis for additional prosecution or sentence. *Id.* at 567-68.

We, contrarily, do not adhere to the merger rule. *See* Brimmage v. State, 93 Nev. 434, 567 P.2d 54 (1977). Because a defendant in our jurisdiction can be convicted and sentenced for both robbery and felony murder, we decline to follow that part of the reasoning set forth in *Cherry.* With regard to the potentially disproportionate treatment basis of the *Cherry* reasoning, we note that the U.S. Supreme Court has implicitly approved the use of the underlying felony in felony murder cases as a valid aggravating circumstance to support the imposition of the death sentence. *See* Proffitt v. Florida, 428 U.S. 242 (1976); Gregg v. Georgia, 428 U.S. 153 (1976). Florida and Georgia statutes both specify as aggravating circumstances cognizable by a jury, murder commit-

---

[4]The particular aggravating circumstances found by the jury provided as follows:

NRS 200.033(2): The murder was committed by a person who was previously convicted of another murder or of a felony involving the use or threat of violence to the person of another.

NRS 200.033(4): The murder was committed while the person was engaged, or was an accomplice, in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery, sexual assault, arson in the first degree, burglary or kidnapping in the first degree.

This latter subsection has subsequently been modified by the legislature to limit its uses to situations in which the defendant (1) killed or attempted to kill the person murdered; or (2) knew or had reason to know that life would be taken or lethal force used. 1983 Nev. Stats. ch. 110, § 1, at 286.

ted by a defendant during the course of a robbery or an armed robbery. *Proffitt,* 428 U.S. at 248-49 n. 6 (robbery); *Gregg,* 428 U.S. at 165-66 n. 9 (armed robbery). Neither state's list of aggravating circumstances includes an element of murder committed with premeditation or deliberation. Our legislature has similarly provided that murder committed while the defendant was engaged in the commission of a robbery may be considered as an aggravating circumstance, while the elements of a murder committed with premeditation and deliberation may not. We need not reject the former provision merely because the legislature has chosen not to treat an arguably worse class of offender in similar fashion. Moreover, any seeming disparity between a life sentence for premeditated murder and a death sentence for felony murder would be examined by this Court under its statutory obligation to automatically review sentences of death. NRS 177.055. Sections 2(c) and (d) of that statute provide that we must consider whether the sentence of death "was imposed under the influence of passion, prejudice or any arbitrary factor" and "is excessive or disproportionate to the penalty imposed in similar cases." Thus, NRS 200.033 is facially constitutional and under our present statutory scheme we have determined that it was applied constitutionally in the instant case. *See* State v. Pritchett, 621 S.W.2d 127, 140-41 (Tenn. 1981). Furthermore, a defendant convicted of a felony murder will not "automatically" receive the death penalty merely because he initially faces one aggravating circumstance. The jury is free to find that "any . . . mitigating circumstance" outweighs that aggravating factor, NRS 200.035, and is not required to automatically impose death. *See* Coleman v. State, 378 So.2d 640, 646-47 (Miss. 1979). We therefore reject the contention that the underlying felony cannot be considered as an aggravating circumstance.

Fourth, we consider whether instructing the jury at sentencing regarding the possibility of pardon or parole constituted reversible error. NRS 175.161(7) provides that, upon request of either party, the jury must be informed that in cases where life without possibility of parole is a possible penalty, "such penalty does not exclude executive clemency." An instruction given at sentencing advised the jury that the State Board of Pardons Commissioners has power to modify any sentence at a later date.[5] Recognizing the

---

[5] Instruction No. 5, given to the jury during the penalty hearing, provides:

  If the penalty is fixed at life imprisonment with the possibility of parole, eligibility for parole begins when a minimum of ten years has been served. if the penalty is fixed at life imprisonment without the possibility of parole, the defendant shall not be eligible for parole. Under the laws of the State of Nevada, any sentence imposed by the jury may be reviewed by the State Board of Pardon Commissioners. Whatever sentence you return in your verdict, this Court will impose that sentence.

recent decision of the U.S. Supreme Court upholding the constitutionality of a similar statute in California v. Ramos, 103 S.Ct. 3446 (1983), Petrocelli urges this Court to extend protection for defendants in Nevada beyond the federal Constitution.[6] We, however, defer to the will of our state legislature, NRS 175.161(7), and decline to do so.

Regarding this contention, Petrocelli argues that a jury instruction concerning the possibility of pardon or parole goes beyond what may be presented at the penalty hearing, as set forth in NRS 175.552.[7] While Petrocelli claims that only evidence relative to the offense, defendant or victim is admissible, the statute also provides that "any other matter which the court deems relevant to sentence" may also be presented. *Accord* Allen v. State, 99 Nev. 485, 665 P.2d 238 (1983). We hold that the instruction regarding the possibility of pardon or parole is relevant to the defendant's sentence. Petrocelli also argues that the instruction injects a level of speculative passion, prejudice and arbitrariness to sentencing which is prohibited in NRS 177.055(2)(c). He asserts that a defendant may be sentenced to death merely because one jury perceives a greater likelihood of commutation or parole than another jury. The U.S. Supreme Court specifically addressed this argument with regard to the federal Constitution and held that such an instruction does not run afoul of constraints against arbitrary and capricious sentencing patterns, and that the possibility of commutation is not too speculative of an element for the jury's consideration. 103 S.Ct. at 3451-54. We concur in the Court's reasoning and hold that the instruction given here likewise did not violate NRS 177.055(2)(c).

---

Whether or not the State Board of Pardon Commissioners upon review, if requested by the defendant, would change that sentence, this Court has no way of knowing. The State Board of Pardon Commissioners, however, would have the power to modify any sentence at a later date.

[6]While the U.S. Supreme Court in *California v. Ramos* considered a governor's power to commute sentences and we here consider our Board of Pardons Commissioners' power to do likewise, we note that the arguments regarding the impact of the challenged instructions on juries made in both cases are substantially the same, despite the different sources of executive clemency.

[7]NRS 175.552 provides, in pertinent part:

*175.552 Penalty hearing: Requirement; jury; panel of judges; evidence.* Upon a finding that a defendant is guilty of murder of the first degree, the court shall conduct a separate penalty hearing to determine whether the defendant shall be sentenced to death or to life imprisonment with or without possibility of parole. . . . In the hearing, evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible. . . .

Petrocelli next argues that the challenged statute effectively invites the jury to unfairly impose a penalty—death or life without possibility of parole—most certain to prevent the defendant from walking the streets again. He primarily supports his contention by reference to Justice Steven's dissent in *California v. Ramos.* The argument is not persuasive in light of the majority's holding to the contrary. As with the Briggs Instruction in *California v. Ramos,* the instruction here did not limit the jury to two sentencing choices. "Instead, it places before the jury an additional element to be considered, along with many other factors, in determining which sentence is appropriate under the circumstances of the defendant's case." *Id.* at 3456. We agree. Petrocelli also relies upon Serrano v. State, 84 Nev. 676, 447 P.2d 497 (1968), contending that a jury should not consider possible future modifications of its sentence. In *Serrano,* and again in Summers v. State, 86 Nev. 210, 467 P.2d 98 (1970), however, we explicitly held that the determination of whether parole should be considered at some future date is within the province of the jury.

Notwithstanding our conclusion that the instruction given here did not constitute error, we are concerned about the variety of such instructions we have seen on appeal and the nuances contained therein. Certain of the instructions have, by commission or omission, not been totally accurate or suitable. We therefore conclude, given the magnitude of the cases involved and the need to avoid prospective reversals resulting from unacceptable versions of this type of instruction, that hereafter (unless and until the law on the subject is modified), in all trials commenced after the publication of this opinion, and when requested by either the state or the defendant, the following instruction, and none other, may be given:

1. Life imprisonment with the possibility of parole is a sentence to life imprisonment which provides that the Defendant would be eligible for parole after a period of ten years. This does not mean that he would be paroled after ten years, but only that he would be eligible after that period of time.

2. Life imprisonment without the possibility of parole means exactly what it says, that the Defendant shall not be eligible for parole.

3. If you sentence the Defendant to death you must assume that the sentence will be carried out.

4. Although under certain circumstances and conditions the State Board of Pardons Commissioners has the power to modify sentences, you are instructed that you may not speculate as to whether the sentence you impose may be changed at a later date.

Finally, Petrocelli argues that the instruction's reference to parole eligibility after a minimum of ten years was error, based on *Serrano*. In *Serrano,* we held, without explanation, that the trial judge's "reference to ten years" in his reply to a deliberating jury's query was error. At the time of Serrano's crime, NRS 200.030(4)(b), which now sets forth the ten-year minimum, had not yet been enacted.[8] The judge's reference to "the new statute," therefore, was error as that statute did not become effective until ten months after the crime was committed. The instant case suffers no such error. Whether the trial judge notified counsel before responding to the jury's query, moreover, does not raise a potential error in the instant case. Here, Instruction No. 5 was formally supplied to the jury before deliberation at the request of counsel, as provided for in NRS 175.161(7). Petrocelli's counsel, additionally, while objecting to the instruction on the grounds of speculativeness and bias favoring the death penalty, did not object at trial to the ten year reference on the basis of *Serrano*. In *Summers,* we reaffirmed *Serrano* based on Bean v. State, 81 Nev. 25, 398 P.2d 251 (1965). "An instruction that discusses parole in a murder case is proper if the jury is not misled and so long as it does not enlarge upon the matter of parole such as requirements of eligibility, how the scheme works, etc." 86 Nev. at 213, 467 P.2d at 100. We hold that the instruction given here did not mislead the jury. While at the time *Bean* and *Serrano* were decided a reference to ten years of minimum service might have been considered to be enlarging upon the matter of parole, the subsequent enactment of NRS 200.030(4)(b) makes the reference here merely a recital of pertinent Nevada law. We also hold, therefore, that the challenged instruction did not enlarge upon the matter of parole. In conclusion, we hold that the instruction given here regarding the power of the Board of Pardons Commissioners to modify any sentence did not constitute reversible error.

Finally, we have determined, after analyzing the circumstances of Petrocelli's crime as required by NRS 177.055(2), that the evidence in the instant case supports the jury's finding of two aggravating circumstances. Our review of the record reveals that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor. We also conclude that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases in this state, considering both the crime and the defendant. *E.g.,* Deutscher v. State, 95 Nev.

---

[8]The ten year minimum service requirement, currently contained in NRS 200.030(4)(b), became effective on July 1, 1967. 1967 Nev. Stats. ch. 211, §§ 43, 701, at 468, 667.

669, 601 P.2d 407 (1979); Bishop v. State, 95 Nev. 511, 597 P.2d 273 (1979). *Cf.* Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978) (life imprisonment); Koza v. State, 100 Nev. 245, 681 P.2d 44 (1984) (life imprisonment).

We hold that all of the errors raised by Petrocelli and enumerated by way of appeal are without merit. Accordingly, we affirm the conviction of first degree murder and the sentence imposing the death penalty.

MANOUKIAN, C. J., SPRINGER, MOWBRAY, and GUNDERSON, JJ., concur.