JAMES LLOYD FELDER, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 20350

April 30, 1991                                    810 P.2d 755

*Morgan D. Harris,* Public Defender and *Steven J. Dahl,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex A. Bell,* District Attorney and *James Tufteland* and *Drew Christensen,* Deputy District Attorneys, Clark County, for Respondent.

_____

[8]THE HONORABLE DAVID ZENOFF, Senior Justice, was appointed to sit in the place of THE HONORABLE ROBERT E. ROSE, Justice. Nev. Const. art. 6, § 19; SCR 10.

## OPINION

*Per Curiam:*

Appellant James Lloyd Felder (Felder) was convicted of first degree murder of Grace Windholtz (Gracie) with use of a deadly weapon and sentenced to two consecutive life terms with the possibility of parole.

A ransom note was found near the body. In order to establish a monetary motive for the killing, the State was allowed to introduce the following evidence: (1) Eight months before the killing, Felder forged signatures to obtain credit cards, and he withdrew

money without permission from certain bank accounts; and (2) two weeks before the killing, a $100,000 check Felder gave his attorney to pay off credit card debts had bounced.

Felder contends that (1) while evidence of his general indebtedness was admissible to show motive, the State was allowed to go too far in proving specific prior bad acts concerning his personal finances; and (2) a reference by the prosecutor to Felder's Vietnam duties was prejudicial misconduct. We conclude that any error was harmless, and Felder was fairly tried, convicted, and sentenced.

## FACTS

On August 2, 1988, Gracie, a Las Vegas casino slot supervisor, was found dead in a closet in her house. She had two .25 caliber bullets in the back of her head and neck. Felder was a "high roller" and made frequent trips from his home in South Carolina to Las Vegas. He met Gracie and her roommate, Brenda Schmitberger (Brenda), where they worked at a local casino, and he often spent time with them and borrowed their car.

On the same day of the discovery of her body, Gracie could not be located for lunch by Felder or Brenda, and Felder went to the Jockey Club where Brenda worked. He told her he could not find Gracie. He also said that Gracie had borrowed $25,000 from him that morning and was meeting someone before lunch. Felder and Brenda went to the house. When Felder opened the door, Brenda saw blood on the floor. He emerged after a few seconds with a piece of paper in his hand saying "get in the car, we've got trouble." He held what appeared to be a ransom note which had been printed on a computer. The note stated that they had Gracie and would not kill her if they received $200,000. Felder told Brenda he could get about $100,000, and he asked her if she could get the same amount.

Brenda then asked Felder if he did it, and he replied "[n]o, and you know better than that." Felder told her they should not get anybody else involved, and he suggested they go to the Hilton to decide what to do. Eventually, Felder went to the police station and an investigation followed. The police found Gracie dead in the closet several hours later. All the doors of the house had been locked, and they saw no signs of forced entry.

With Felder's permission, the police searched his room at the Hilton and found a shoe with blood spots on it and a .25 caliber pistol. The gun was capable of holding seven bullets, six in the magazine and one in the chamber. It had five unspent bullets, four in the magazine and one in the chamber. A firearms expert testified that this was the gun which killed Gracie. No fingerprints were found on the gun or bullets, and fingerprints found inside

the closet where the body was found did not match any of the possible suspects.

Felder's version of what happened when he and Brenda went to the house differs from Brenda's testimony. He says he never asked her for any money or discussed raising money for the ransom, and he never said they should not involve the police. Felder also testified that he usually gave Brenda or Gracie a key to his hotel room when he was in Las Vegas, and he gave them a key this time.

At Felder's residence in South Carolina, police found a partially filled box of .25 caliber ammunition. A document examiner who examined Felder's handwriting testified that the handwritten part of the ransom note was written by Felder.

Felder's roommate and best friend, Kerry Durr, testified that Felder had told him the purpose of his trip to Las Vegas was to obtain $250,000 from a bank in California and associates in Las Vegas, in order to pay off his credit card debts. The .25 caliber gun belonged to Durr's sister. When Durr asked Felder why he was taking a gun, Felder became angry and responded that he had been robbed twice and would not let it happen again. Durr said that after Felder's arrest, Felder called him and asked him to pack up his computer and remove it from their business. He also told Durr to tell the police that he had mailed the pistol to Gracie as a gift.

Durr also testified that Felder was in financial distress and took money from bank accounts without permission, forged signatures to obtain credit cards, and wrote a large check to his attorney, which bounced.

## DISCUSSION

### A. *Testimony regarding prior bad acts*

Felder contends that the State was allowed to go too far in presenting evidence of his general indebtedness and thus violated NRS 48.045 when it elicited evidence of Felder's prior questionable financial activities. Specifically, he objects to his roommate Kerry Durr's testimony and to the fact that there was no hearing under Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), before presentation of that testimony. The State argues that the testimony was needed to demonstrate motive and that the prior acts were closely connected to Felder's apparent scheme to obtain ransom money.

Evidence of a prior bad act is admissible if (1) the prior act is relevant to the crime charged; (2) the prior act is proven by clear and convincing evidence; and (3) the evidence is more probative than prejudicial. Berner v. State, 104 Nev. 695, 765 P.2d 1144

(1988). In Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), this court held that before evidence of a prior bad act can be admitted, the State must show by plain, clear, and convincing evidence that the defendant committed the offense. The judge is to weigh the probative value of the proffered evidence against its prejudicial effect via a hearing outside the presence of the jury, and his or her decision will not be disturbed absent manifest abuse of discretion. Hill v. State, 95 Nev. 327, 594 P.2d 699 (1979). The prosecutor failed to follow the *Petrocelli* requirements. The district judge expressed surprise and annoyance that the evidence of prior bad acts was being offered by the prosecution without a request for a hearing, but he determined that the evidence was admissible. Again, we reiterate that evidence of prior bad acts should be submitted to the court outside the presence of the jury so the judge may make a careful decision as to its admissibility. Nevertheless, since the district judge did rule that the evidence was admissible, we will review the evidence and determine whether the court abused its discretion.

First, Felder objects to Durr's testimony that about eight months before the murder, Felder had withdrawn $2,000 without permission from a joint account owned by Felder and Durr, and about $30,000 from Felder's parents' account. The State used the testimony to establish that Felder needed money, which goes to his motive for committing the murder. We conclude that the district court did not abuse its discretion in allowing Durr's testimony concerning the bank account withdrawals.

Second, Felder asserts that the district court erred in allowing Durr's testimony that Felder admitted to him that he had forged signatures in order to obtain credit cards. Felder contends that the State should not have been allowed to point out the fact that the credit cards were obtained by forgery, and the court should have limited the State to proof of the general amounts of his credit card debts. We conclude that the fact of forgery may indicate desperation and was therefore properly admitted to prove motive.

Third, Felder argues that the court erred in admitting Durr's testimony that Felder had bounced a $100,000 check to his attorney. According to Durr, about two weeks before the murder, he saw Felder make out a $100,000 check to his attorney to pay off his credit card debts. Soon thereafter, Durr had a conversation with Felder's attorney about the check. Then, after Felder went to Las Vegas, Durr spoke to Felder on the telephone and told him that his lawyer had said the check bounced. Felder contends that

Durr's statement about what Felder's attorney had said was inadmissible hearsay. We conclude that the attorney's statement was in fact hearsay and was not admissible under any exception. However, because the State presented other, admissible evidence at trial to establish that Felder was in financial distress, this hearsay evidence was only cumulative. Furthermore, we do not consider the fact that Felder bounced a check written to his attorney so prejudicial. Therefore, we conclude that the error was harmless. *See* Big Pond v. State, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985).

## B. *Alleged prosecutorial misconduct*

Felder argues that the prosecutor committed misconduct which constitutes reversible error when he referred to Felder's service in Vietnam. The State responds that this remark was a legitimate attempt to rebut Felder's unsolicited statement that he was incapable of killing Gracie.

On cross-examination of Durr, defense counsel brought out that Felder was a medic and performed helicopter rescues in Vietnam. On redirect, the prosecutor asked whether Felder used a gun during his helicopter rescue duties in Vietnam. Durr replied that Felder occasionally cleared the rescue area with gunfire. Later, during cross-examination of Felder, Felder said "I would have been smarter than to write a ransom note if I would have been capable of doing this in the first place." The prosecutor then asked: "Well, you're the same guy who used to fire on the Vietnamese as you dropped in the jungle, aren't you?" At this point, defense counsel objected, and the jurors were dismissed. Defense counsel requested a mistrial, but they did not request that the comment be stricken from the record or that the jury be admonished to disregard it. Although the court expressed some disapproval of the prosecutor's remark, it denied the defense motion for a mistrial. After a brief recess, the prosecution began a different line of questioning.

The prosecutor's comment was harsh and unrestrained, and it improperly implied that because Felder fired to clear the area before landing, he was firing at people. Caution must be taken in permitting testimony or remarks about a defendant's actions in a war or combat situation in the armed services. Nonetheless, this was just one remark made during a trial of several days. Further, the defense did not request any remedial measures short of a mistrial. We conclude that it was harmless error beyond a reasonable doubt. *See* McMichael v. State, 98 Nev. 1, 638 P.2d 402 (1982).

243

## C. *The reasonable doubt instruction*

Finally, Felder argues that the reasonable doubt jury instruction given by the district court violated the due process clause of the United States and Nevada Constitutions in light of Cage v. Louisiana, 111 S.Ct. 328, 329 (1990). However, in Lord v. State, 107 Nev. 28, 806 P.2d 548 (1991), we upheld the Nevada reasonable doubt instruction, despite the *Cage* decision. Therefore, we conclude that the instruction was proper.

For the reasons noted above, we conclude that Felder's contentions are without merit. We therefore affirm the conviction entered by the district court.