THE STATE OF NEVADA, APPELLANT, *v.* MARSHALL TIMOTHY SHADE, RESPONDENT.

No. 24986

July 27, 1995                                           900 P.2d 327

---

*Frankie Sue Del Papa,* Attorney General, Carson City; *Richard A. Gammick,* District Attorney, and *Gary H. Hatlestad* and *Thomas E. Viloria,* Deputy District Attorneys, Washoe County for Appellant.

*David Houston* and *Scott Freeman,* Reno, for Respondent.

## OPINION

By the Court, ROSE, J.:

Respondent Marshall Timothy Shade was driving his stepson, Peter Kenneson, in Kenneson's car when Kenneson purchased over twelve grams of heroin intending to resell it. Shade was later pulled over, and officers found methamphetamines and cocaine on the floorboard of the car. Shade was charged with two counts of possessing a controlled substance and two counts of transporting a controlled substance (methamphetamines and cocaine).

Shade moved in limine to exclude all evidence related to Kenneson's heroin dealings. Shade claimed that because he had not been charged for any crimes related to heroin, the State could not refer to such matters in his prosecution for possession and transportation of methamphetamines and cocaine. The district court granted Shade's motion. Immediately following this ruling, Shade moved to dismiss. The State offered no opposition, and the motion was granted.

The State appeals and argues that the district court abused its discretion by excluding the evidence related to the heroin sale. We conclude that the State is correct. The evidence of the heroin sale arose out of the same sequence of events and was so closely related to the crimes charged that under the *res gestae* doctrine it could not be excluded. Accordingly, we reverse the district court's order.

### FACTS

The State was prepared to present the following evidence at trial. In early August, 1992, police informant Ray Richardson contacted Kenneson to arrange a heroin purchase. Richardson was working with the Washoe County Consolidated Narcotics Unit (CNU). On August 21, 1992, CNU agents fitted Richardson with a listening device, gave him $2,400.00 in recorded "buy money," and followed him to Kenneson's apartment, where the initial contact was to take place.

As Richardson arrived at the complex, Kenneson was driving out of the parking lot; his stepfather, Shade, was in the passenger's seat. Richardson walked over to the driver's side window of Kenneson's car, leaned in, and handed Kenneson $1,600.00 in cash. Kenneson counted the money and told Richardson, "There ain't no $3,000.00 here." Richardson responded, "Get what you can." Kenneson asked Richardson if he wanted some "crank" or some "coke." Richardson replied, "All I want is the heroin and

get back as quickly as you can." Kenneson testified that this conversation took place in front of Shade, who was sitting next to him. During the conversation, Shade said nothing other than to ask Richardson for a "dip" of chewing tobacco.

Immediately following their contact with Richardson, Kenneson and Shade drove to the Bavarian Plaza. Kenneson left his car and tried to phone a drug dealer to arrange the heroin purchase. Shade stayed at the vehicle. When Kenneson returned, he and Shade drove to the parking lot of the Reno Ramada Hotel. Kenneson left Shade in the vehicle and entered a house on Sixth Street. He came back to the car with a drug dealer named Pepe, and all three men drove to an apartment complex on Neil Road. Shade again stayed in the car while Kenneson and Pepe went into an apartment to make another phone call. They later rejoined Shade and drove back to the house on Sixth Street.

Kenneson testified that before entering the house, Shade handed him approximately $400.00 and told him to purchase some methamphetamines and cocaine for Shade's personal use. Shade left Kenneson at the house and drove off. Kenneson purchased 12.7 grams of heroin, two eight balls of methamphetamines, and one eight ball of cocaine. (One eight ball equals approximately three and one-half grams). The dealer did not have the proper amount of methamphetamines so Kenneson was unable to buy all the drugs that Shade had requested. Shade returned to pick up Kenneson approximately thirty minutes later. Kenneson gave Shade one eight ball of cocaine and one eight ball of methamphetamines. He also returned $100.00 to Shade as a result of the unfulfilled drug order. The CNU agents later discovered that this $100.00 was one of the recorded bills provided to Kenneson by the informant.

Shade drove Kenneson from the house on Sixth Street to the Sparks' Cinema where Kenneson was to deliver the heroin. Kenneson testified that Shade knew he had purchased heroin and had even smelled the drug before they left for the theater, but that he did not inform Shade why they were going to the Sparks' Cinema.

Shade dropped Kenneson off at the theater and drove away. Officers arrested Kenneson after he passed the heroin to the informant. A short time later, Shade was pulled over and arrested. On the driver's side floorboard, officers found one large bag with two smaller baggies resting inside. The baggies contained methamphetamines and cocaine. Officers also found the $100.00 bill marked as buy money in Shade's front pocket. Finally, officers found $1,897.00 cash in Shade's possession. Shade later established that the $1,897.00 was in his possession as a result of cashing his most recent paycheck.

During all of these events, CNU officers were following Kenneson and Shade. Officers testified that during the times Shade was alone in Kenneson's vehicle, he appeared to be acting as a lookout. One of the officers opined that Shade was engaged in some form of counter surveillance.

Shade was originally charged with several offenses stemming from the heroin transaction and with two counts of possessing a controlled substance (cocaine and methamphetamines). Shade filed a pretrial habeas corpus petition that was granted by the district court. On appeal, this court affirmed the dismissal of the heroin charges but reversed the dismissal of the charges of possession of methamphetamines and cocaine. Sheriff v. Shade, 109 Nev. 826, 858 P.2d 840 (1993).

Upon remand, the case was reintroduced to the Washoe County grand jury. Shade was indicted on two counts of possession of a controlled substance and two counts of transportation of a controlled substance (methamphetamines and cocaine). Shade then moved in limine to exclude all evidence related to the following: (1) the drug activity of Kenneson; (2) Kenneson's involvement in the sale of heroin to confidential informant Richardson; (3) Richardson's knowledge of Kenneson as a drug dealer; (4) the $100.00 in "buy money" found in Shade's possession; (5) the $1,897.00 in cash found in Shade's possession; (6) the counter surveillance allegations made by CNU officers; (7) CNU's surveillance of Shade; (8) CNU's surveillance of Kenneson and/or the confidential informant; (9) any notes made by CNU officers related to the heroin sale; (10) any statements made by Kenneson and/or the informant regarding the heroin sale; (11) any statement made by Kenneson regarding the heroin sale; (12) any discussion regarding heroin; (13) any statement made by the confidential informant during his "debriefing" after the heroin purchase; (14) any statements related to the informant being wired with a listening device; and (15) any and all evidence in whatever form relating to the confidential informant.

The district judge granted this motion and excluded all of the foregoing evidentiary items, except the evidence related to the $100.00 marked bill found in Shade's possession. Following this ruling, the prosecutor informed the district court that the State was not prepared to continue with the prosecution. Shade's attorneys immediately moved to dismiss all charges. The prosecutor did not offer any opposition, and the district court dismissed all charges against Shade.

The State directly appealed from this evidentiary ruling. State v. Shade, 110 Nev. 57, 867 P.2d 393 (1994) (*Shade II*). We partially dismissed the appeal, concluding that we lacked jurisdiction to consider direct appeals from in limine evidentiary

rulings of the district court. We noted, however, that we could consider the evidentiary ruling in the context of an appeal from the order of dismissal. That appeal is now before us.

## DISCUSSION

As a preliminary matter, Shade contends that this court does not have jurisdiction to consider the State's appeal. He argues that NRS 177.025 supports the proposition that this court cannot review discretionary decisions of the district court, such as to exclude evidence. Shade also argues that the State waived its right to appeal by not opposing his oral motion to dismiss in district court.

Shade is incorrect. First, NRS 177.025 provides that in criminal matters, "appeal to the supreme court from the district court can be taken on questions of law alone." Nothing in this statute prohibits this court from reviewing discretionary decisions of the district court. If a district court abuses its discretion in making an evidentiary determination, it errs as a matter of law. Second, the State's right to appeal does not rest on its objecting to a motion to dismiss. NRS 177.015(1)(b) specifically provides that in a criminal action either the State or the defendant may appeal to this court "from an order of the district court granting a motion to dismiss."

In considering an appeal from the entry of final judgment, this court has jurisdiction to review all intermediate orders of the district court. NRS 177.045. As we stated in *Shade II:* "This court may nonetheless consider the issue of the exclusion of the evidence in the context of the appeal from the order granting Shade's motion to dismiss." *Shade II,* 110 Nev. at 63, 867 P.2d at 397. This court therefore has jurisdiction to consider whether the district court erred by excluding the evidence related to the heroin transaction.

The decision to exclude evidence is within the district court's sound discretion. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985). This court will not reverse such a determination absent manifest error. *Id.*

In this case, the district court held that while evidence of the heroin purchase was relevant to prove that Shade knew he was in possession of cocaine and methamphetamines, the prejudice of such evidence outweighed its probative value. After commenting upon Nevada precedent describing the prior bad act evidentiary

doctrine, the district court excluded all evidence related to the heroin purchase and the accompanying surveillance. The district court did not specifically address the State's contentions that the evidence was admissible under Nevada's *res gestae* rule.

In Allan v. State, 92 Nev. 318, 549 P.2d 1402 (1976), this court explained the *res gestae* doctrine.

> [W]hen several crimes are intermixed or blended with one another, or connected such that they form an indivisible criminal transaction, and when full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the others, evidence of any or all of them is admissible against a defendant on trial for any offense which is itself a detail of the whole criminal scheme.

*Id.* at 321, 549 P.2d at 1404 (citing People v. Thomas, 83 Cal. Rptr. 879 (Ct. App. 1970)).

In *Allan,* the defendant was charged and convicted of one count of the infamous crime against nature for performing fellatio on one minor boy. The defendant argued on appeal that the district court erred by admitting evidence of uncharged offenses including an act of fellatio on another boy. As in the instant case, he claimed that this evidence was highly prejudicial and unrelated to the crime charged.

This court disagreed and held that the evidence was admissible under the *res gestae* rule or the "complete story principle":

> The testimony regarding the additional acts of fellatio, as well as the act of masturbation, was admissible as part of the *res gestae* of the crime charged. Testimony regarding such acts is admissible because the acts complete the story of the crime charged by proving the immediate context of happenings near in time and place. Such evidence has been characterized as the same transaction or the *res gestae.*

*Id.* at 320, 549 P.2d at 1403 (footnote omitted); *see also* State v. Villavicencio, 388 P.2d 245 (Ariz. 1964) (undercover agent's testimony that the accused made an uncharged sale to a third person while selling to the agent was admissible under *res gestae* doctrine).

In the case at bar, the possession and transportation charges against Shade allegedly arose out of the same transaction as the heroin sale, yet the district court excluded all evidence related to Kenneson's drug activities and the agents' surveillance of those activities. The court disregarded the State's *res gestae* argument and focused solely on the prejudice stemming from prior bad act evidence.

NRS 48.035(1) provides: "Although relevant, evidence is not

admissible if its probative value is substantially outweighed by the danger of unfair prejudice." However, NRS 48.035(3) codifies the *res gestae* rule and further provides:

> Evidence of another act or crime which is so closely related to an act in controversy or a crime charged that an ordinary witness cannot describe the act in controversy or the crime charged without referring to the other act or crime *shall not be excluded,* but at the request of an interested party, a cautionary instruction shall be given explaining the reason for its admission.

(Emphasis added.)

In reading NRS 48.035 as a whole, it is clear that where the *res gestae* doctrine is applicable, the determinative analysis is not a weighing of the prejudicial effect of evidence of other bad acts against the probative value of that evidence. If the doctrine of *res gestae* is invoked, the controlling question is whether witnesses can describe the crime charged without referring to related uncharged acts. If the court determines that testimony relevant to the charged crime cannot be introduced without reference to uncharged acts, it must not exclude the evidence of the uncharged acts.[1]

In this case, the lower court's evidentiary exclusions prohibit key witnesses from describing how Shade obtained the methamphetamines and cocaine. Kenneson testified to the grand jury that Shade gave him approximately $400.00 to purchase the drugs. Kenneson then obtained the methamphetamines and cocaine for Shade when he purchased the heroin. Narcotics agents heard Kenneson ask Richardson, while Shade was present, if he wanted any methamphetamines or cocaine. Due to the district court's ruling, the State cannot adequately inform the jury how methamphetamines and cocaine turned up in Shade's immediate proximity.

If the agents are not allowed to testify regarding their surveillance, the State cannot inform the jury how Shade obtained the

---

[1]Shade claims that in Cirillo v. State, 96 Nev. 489, 611 P.2d 1093 (1980), this court ruled that even where *res gestae* was applicable, the trial court could exclude such evidence where it was unduly prejudicial. This is incorrect. The *Cirillo* court determined that the subject evidence did not come within the purview of NRS 48.035(3) because the witnesses were able to testify *without* referencing other uncharged activity. As a result, this court reversed the accused's conviction because the trial court improperly admitted evidence of prior unrelated crimes. The foundation of the *Cirillo* decision rested upon exclusion of prior bad act evidence and not *res gestae. Id.* at 493-94, 611 P.2d at 1096.

drugs or that officers suspected Shade was participating as a lookout during the purchase of the drugs that were ultimately found in the car he was driving. Without such testimony, the State cannot effectively prosecute the transportation of illegal narcotics charges pending against Shade.

The charges at issue were contemporaneous to the heroin purchase, arose out of the same transaction, and involved the same participants. The excluded evidence was inextricably intertwined with the charged crimes and completed the story leading up to Shade's ultimate arrest. We conclude that the State's witnesses could not adequately testify about the methamphetamines and cocaine charges without some reference to the heroin sale and the accompanying surveillance activity. The district court thus abused its discretion by granting the motion in limine. The district court should have admitted the evidence and issued a cautionary instruction to the jury.[2]

## CONCLUSION

The State's witnesses could not effectively testify as to the complete story of Shade's possession and transportation charges without mentioning the closely related events of the heroin purchase. Therefore, the district court erred by not admitting the excluded evidence under the *res gestae* doctrine and issuing the jury a cautionary instruction.

Accordingly, we reverse the district court's order dismissing the charges and remand this case for further proceedings before a different district court judge.

STEFFEN, C. J., and SHEARING, J., concur.

YOUNG, J., dissenting:

The State, in an effort to buttress an already formidable case against Shade, sought to introduce *res gestae* evidence pertaining to other alleged acts of the respondent. The *res gestae* doctrine has never been a favorite of the law. As Lord Blackburn once said, "If you wish to tender inadmissible evidence, say it is a part of the res gestae." John Bevan Coulson Tregarthen, *The Law of Hearsay Evidence* 21 (1915).

I respectfully submit that the State, in its zeal to gild the evidentiary lily with *res gestae* evidence against Shade, erred when it refused to proceed with the prosecution.

---

[2]Given this disposition of the case, we need not reach the issue of whether the excluded evidence should also have been admitted as proof, pursuant to NRS 48.045(2), that Shade had knowledge of the controlled substances he was found with.

In another case involving the respondent, State v. Shade, 110 Nev. 57, 63, 867 P.2d 393, 396 (1994), we concluded that a district court's decision to exclude evidence was not subject to direct appeal. We noted, however, that we may consider the issue of the exclusion of the evidence on appeal from an order of the district court granting a motion to dismiss. *Id.* at 63, 867 P.2d at 397. However, I do not believe that we implied that the State may obtain appellate review of such an issue any time it pleases simply by refusing to prosecute its case.

The State's appeal rights are created by statute. *See id.* The State may waive this statutory right by voluntary acts or conduct, such as causing judgment to be entered against it. *See* 4 Am. Jur. 2d *Appeal and Error* §§ 235, 242-43 (1962); Deason v. Lewis, 706 P.2d 1283, 1286 (Colo. Ct. App. 1985) (noting that consent to dismissal prevented plaintiff from appealing); State v. Harmon, 243 S.W.2d 326, 328 (Mo. 1951) (holding that a criminal defendant may waive his right to appeal); Trees v. Lewis, 738 P.2d 612, 613 (Utah 1987) (citing the general rule that one who acquiesces in judgment cannot later appeal the judgment). As a general rule, "[a] party who abandons an action thereby waives his right to appellate review of the judgment rendered therein." 4 Am. Jur. 2d *Appeal and Error* § 235 (1962).

The State did nothing less than abandon its case by refusing to proceed. When asked if it would prosecute, the State responded that it was "standing mute." Manifestly, the district court could not force the State to proceed. In a high profile murder trial started earlier this year in Los Angeles, would the State have stood mute if the trial court had rejected some of its evidentiary offerings? I cannot seriously entertain the notion that this would have occurred. However, were the State so inclined, defense attorneys, who on occasion had exhibited some discordance, would have sung out for dismissal in spontaneous, four-part harmony. The trial court could not have been faulted if it had found their strains to be persuasive.

Moreover, *the district court was obligated to protect Shade's right to a speedy trial. See* NRS 178.556 (outlining circumstances in which the district court may dismiss an action for the State's delay); Creps v. State, 94 Nev. 351, 355, 581 P.2d 842, 845, *cert. denied,* 439 U.S. 981 (1978) (noting that the State must show good cause for trial delay). I submit respectfully that the district court had no other choice. When the State refused to proceed and present any evidence, dismissal was inevitable.

I am not suggesting that the State may never consent to a dismissal. Indeed, in some circumstances, the State is ethically obligated to do so. *See* SCR 179(1) (forbidding the State from pursuing a charge that the State knows is not supported by

probable cause). This appeal presents none of these circum-stances. First, the State apparently did not intend to end this case when, by its conduct, it invited the district court to enter an order of dismissal. The State was not concerned that it was prosecuting an innocent man. Second, no one, not even the State, can blame the district court for dismissing a case that the State refused to prosecute. In fact, when asked if the State wanted to put the court in the position of dismissing the case, the State answered that dismissing the case would be "the proper thing to do." Yet, the State is, by its conduct, now saying quite the opposite by appeal-ing a dismissal that the State itself instigated. The State is really only concerned with the district court's evidentiary rulings. We have already stated that these rulings are not subject to direct appeal.

Despite the evidentiary rulings by the trial court, there remained in this case a wealth of evidence which, if believed, would have supported a conviction. To find Shade guilty of possessing cocaine or methamphetamine, the State was obligated to show that Shade knowingly or intentionally possessed the substances without excuse. *See* NRS 453.336(1). The State was not prevented from showing that Shade possessed a marked $100 bill returned to Shade by Kenneson when Kenneson failed to procure the proper amount of methamphetamine. Officers Ter-rell, Lodge, Dyer, and Leal could have testified, as they did before the grand jury, that after Shade, the driver of the Kenneson car, was stopped, they saw a plastic sandwich-type baggie con-taining two smaller baggies of cocaine and methamphetamine on the driver's side floorboard. Arresting officers could also have testified that the drug was in plain view. Kenneson could have been called to testify that although Shade was driving Kenneson's car, the drugs were on the driver's side floorboard (these were the drugs Shade was charged with possessing) and the drugs did not belong to Kenneson. The officers could have testified that they had seen no one else in the car. In addition, the State was prepared to call a number of witnesses to rebut Shade if he denied that he knew the baggies contained drugs.

In the parlance of the poker table, instead of playing out this formidable evidentiary hand, the State folded. I submit that this court should not now give the State another chance by stacking the deck and redealing the cards. Shade cannot be blamed for the State's decision to gamble that by standing mute and appealing, it might, under a *res gestae* theory, have additional evidence against Shade.

Based on the foregoing, I cannot conclude that the State acted reasonably and in good faith when it refused to proceed. No statute of which I am aware permits the State to delay timely

prosecution because it thinks that through some appellate legerde-main, it might be able to present additional evidence. This practice would allow the State at any time to initiate an interlocu-tory appeal of a decision to exclude evidence by, in effect, forcing the trial court to dismiss the case. If we allow the State to do this, it will render *Shade II* meaningless.

Our task on appeal is to consider where the district court erred. It may well be that there was error committed during the proceed-ings below, but not by the district judge. Accordingly, I dissent.

SPRINGER, J., dissenting:

I join in JUSTICE YOUNG's dissent and stress his point that no one "can blame the district court for dismissing a case that the State refused to prosecute." The prosecutor did not like the way the State's case was going and announced to the court:

> [T]he State is not in a position to proceed with further prosecution of Marshall Timothy Shade. * * *
> We are unprepared to proceed at this time . . . .

The prosecutor threw in the towel; or, to use another sports metaphor, he decided to take his ball and go home.

After the trial court judge heard deputy district attorney Viloria tell the court that he was unprepared to go ahead with the State's case, the judge was entitled and duty-bound to say something like, "Very well Mr. Viloria, the court will accept your statement of unpreparedness and will dismiss the State's case." At this juncture the trial judge had no choice other than to dismiss the charges. The trial judge stated for the record that he was "at somewhat of a loss to understand why the State is unable to go forward with this case"; and it was with some reluctance that he dismissed the charges. I too am at a complete loss as to why the prosecutor was "unprepared" to proceed or, more accurately, why the prosecutor *refused* to go ahead with his case because he did not like some of the trial judge's evidence rulings. As I read this record, Mr. Viloria had a tantrum and simply would not proceed in a case in which the judge was making rulings that did not please him.

It makes absolutely no difference whether the trial judge was right or wrong in making the rulings that aroused the ire of Mr. Viloria and prompted him to refuse to proceed with the State's case. Even if the trial judge had been *clearly* incorrect in some of his rulings, the point is that no litigant that I have ever heard of is privileged, in mid-trial, to say: "I do not like the way things are going here—let's start all over again."

It does not appear to me that even Mr. Viloria ever dreamt that he was going to get a chance to start this prosecution all over

again after he refused to present any further evidence in the first trial. Mr. Viloria's position at trial was simply that the trial judge could not make him go ahead if he chose not to do so. He never suggested to the court that he wanted another shot at it. Mr. Viloria told the trial judge that he "believe[d] that the case cannot be proven." He then went on to say that "that's all that's required. If I have a lack of good-faith belief in a successful prosecution, it's not for the judiciary to question the executive branch."[1] I certainly agree with the prosecutor's statement that the "judiciary" cannot compel a prosecutor to proceed when he has a "good-faith belief" that "the case cannot be proven." Where I get lost is when this court tells the prosecution that after it makes a decision not to prosecute, it can simply start out all over again, hopefully with a judge that is more attuned to the State's perception of the case.

I have read the majority opinion over and over again trying to discover some explanation of why it might want to allow the State to prosecute Mr. Shade again after it declined to prosecute him in his last trial. The majority prates on for several pages about "*res gestae*" but never addresses the real issue in this case, which is whether, henceforth, the State is going to be permitted to drop any criminal case and start all over again whenever the trial court makes a ruling that prosecutors suspect might spell disaster for the State's case.

The judgment of this court as it is presently written vacates the trial court's proper and unavoidable dismissal of charges against Shade and remands the matter for "further proceedings" on the same charges. What further proceedings can possibly be conducted? Does the majority really intend to permit a *new trial* in this case—to permit the prosecution to try Mr. Shade all over again, hopefully before a judge who is more sympathetic to the prosecution? If this is what the majority intends, then there is no reason why we should not expect to see a *Shade III* or even a *Shade IV,* because all the prosecution has to do when it sees itself as getting a little the worst of it is to say the magic words, "The State is not in a position to proceed with further prosecution of Marshall Timothy Shade," and then be allowed to commence the prosecution anew. It looks like double jeopardy to me.

If the majority truly intends that Mr. Shade be tried again on the same charges, it ought to have ordered a new trial explicitly

---

[1] The prosecutor took the position that he had the constitutional right to *demand* dismissal. Shade's counsel could not and did not contest this right and did, in fact, accede to the dismissal by moving, himself, for dismissal. Defense counsel's motion is, of course, of no consequence because the trial judge was bound to dismiss when the State's attorney announced his refusal to proceed with the prosecution.

so that Mr. Shade could have immediate access to the federal judicial system. I am still not absolutely sure that this is the majority's intention, for it is really hard for me to accept as the law of this state the proposition that a prosecutor can announce to the trial court his or her refusal to proceed with the State's case and then be permitted to try the case again on another day.

The trial court could have done nothing other than what it did in this case. When the State announced that it was "unprepared to proceed," the trial court was compelled to dismiss the State's case. (As Mr. Viloria told the court: "[I]t's not for the judiciary to question the executive branch.") The trial court did dismiss the case; and there was certainly no error in doing so. When the case was dismissed, however, it was dismissed forever; and the State cannot be permitted to give it another try.