ROBERTO HERNANDEZ MIRANDA, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 14553

October 7, 1985                    707 P.2d 1121

*Morgan D. Harris,* Public Defender, and *Thomas W. Rigsby,*
Deputy Public Defender, Clark County, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Robert J.
Miller,* District Attorney, and *James Tufteland,* Deputy District
Attorney, Clark County, for Respondent.

## OPINION

By the Court, STEFFEN, J.:

Following a jury trial, appellant was convicted of one count each of first degree murder with the use of a deadly weapon, robbery with the use of a deadly weapon and grand larceny. Following a separate penalty hearing, the jury imposed the death sentence on appellant for his first degree murder conviction. Appellant now appeals from the judgment of conviction and from the imposition of the death sentence. For the reasons set forth below, we affirm the judgment of conviction and the imposition of the death sentence.

### THE FACTS

At Miranda's jury trial, Fernando Cabrera, an acquaintance of Miranda, testified that on the evening of August 8, 1981, Miranda asked him for a ride to the victim's home in Las Vegas. According to Fernando, he drove Miranda to the victim's home, and waited in his car in front of the victim's home for approximately one hour before entering the victim's home. When Fernando entered the home, he saw the victim's body on the floor, and saw that appellant was covered with blood and was holding a knife.

According to Fernando, when he entered the home Miranda advised him that he had gone to the victim's home "for drugs" and that "they tricked" him. Miranda then told Fernando to help him search the house for valuables. Because he apparently feared Miranda, Fernando helped him search the house, and helped Miranda take a television set and stereo from the victim's home. The two men also took a watch and ring from the victim, which Miranda told Fernando to keep. Fernando testified that Miranda was wearing gloves while they searched the victim's home.

Fernando also testified that Miranda approached him the next day, and again asked him for a ride to the victim's home, this time to take the victim's truck and to dispose of some incriminating evidence Miranda thought might have been left in the home. Fernando drove Miranda to the victim's home, along with a third party, Emmett Anderson, whom the state was unable to locate prior to trial. Apparently because Miranda did not know how to drive a manual transmission, Fernando drove the truck to Fernando's apartment, with Miranda and Anderson following behind him in Fernando's car.

The victim's body was found on August 10, 1981, by friends of the victim, who immediately called the police. All witnesses agreed that the victim's apartment was in a state of disarray, and several witnesses testified that various items of the victim's property were missing. Police determined that the victim had been

stabbed in the chest by a large knife and had died as a result of a punctured lung sometime thereafter.

Following the above events, Miranda apparently fled to Los Angeles. David Cabrera testified at Miranda's trial that while Miranda was in Los Angeles, he saw what appeared to be a bloodstained shirt in Miranda's suitcase. David Cabrera also testified that Miranda told him he left Las Vegas because he had killed a man during the course of a narcotics transaction.

On his own behalf, Miranda presented several witnesses who testified that Fernando Cabrera had told them that Fernando had actually been the one who committed the murder. Several of Miranda's witnesses also testified that they had seen Fernando in blood-stained clothing shortly after the murder occurred.

Following the guilt phase of Miranda's trial, the jury found him guilty of one count each of first degree murder with the use of a deadly weapon, robbery with the use of a deadly weapon and grand larceny. At the penalty phase of Miranda's trial, the jury sentenced Miranda to death for the first degree murder conviction. The district court also sentenced Miranda to two consecutive fifteen year prison sentences for the conviction of robbery with the use of a deadly weapon, and a ten year concurrent sentence for the grand larceny conviction. Miranda now appeals from each of these convictions and sentences.

## THE GUILT PHASE

Miranda asserts that the district court erred at the guilt phase of his trial by refusing to admit into evidence an out-of-court statement made by Emmett Anderson, the person who Fernando Cabrera claims accompanied Miranda and Fernando to the victim's home the day after the murder. Anderson was not available to testify at trial, and Miranda therefore attempted to introduce into evidence a statement made by Anderson to the police prior to trial indicating that he had not gone to the victim's home with Miranda and Cabrera and that he knew nothing of the murder. The district court refused to admit Anderson's statements on the ground that they constituted inadmissible hearsay.

At trial and again on appeal, Miranda argues that the district court should have admitted Anderson's statements pursuant to NRS 51.315(1). This statute permits a district court to admit the out-of-court statement of a non-testifying party, when the declarant is not available to testify at trial and when the nature of the statement itself and/or the special circumstances under which it was made offer strong assurances of accuracy. *See also* Woods v. State, 101 Nev. 128, 696 P.2d 464 (1985); Johnstone v. State, 92 Nev. 241, 548 P.2d 1362 (1976).

Anderson's statements, however, were not of an inherently

566

trustworthy nature and were not made under special circumstances which might have given rise to strong assurances of accuracy. The statements consisted of Anderson's denial of his own involvement in criminal activity, and were made to police at a time when Anderson was a potential suspect in the crime. Accordingly, the statements were self-serving in nature and unreliable for purposes of admission under NRS 51.315(1). The district court therefore did not err in excluding these statements.

Miranda also contends that the district court erred in excluding from evidence certain transcribed statements Fernando Cabrera made to police prior to trial, many of which were inconsistent with Fernando's trial testimony. The district court excluded the transcribed statements on the ground that they constituted inadmissible hearsay.

At trial and again on appeal, Miranda contends that the district court should have admitted the transcribed statements under the "business records" exception to the hearsay rule contained in NRS 51.135(1).[1] The business records exception to the hearsay rule generally permits a party to introduce into evidence reports made during the regularly conducted course of business. Therefore, the police report itself, which was made when Fernando gave his statement to police, would have been admissible as substantive evidence to demonstrate such things as the date on which the report was made or the fact that the statement was actually taken. *See* United States v. Smith, 521 F.2d 957, 964 (D.C. Cir. 1975). Nevertheless, the business records exception does not itself permit a party to introduce into evidence the actual contents of an out-of-court statement given to police by a witness to a crime concerning the events of the crime itself. *Id.; see* Frias v. Valle, 101 Nev. 219, 698 P.2d 875 (1985). Any statement given by a witness to a police officer is itself hearsay and must itself be independently admissible under a separate and distinct exception to the hearsay rule. *See* United States v. Smith, *supra; see also* NRS 51.365 (hearsay included within hearsay is not excluded under the hearsay rule if each part of the statement is independently admissible under an exception to the hearsay rule).

---

[1]NRS 51.135(1) provides as follows:

1. A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness, is not inadmissible under the hearsay rule unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Although Miranda failed to make this argument either at trial or in his briefs on appeal, to the extent that Fernando's out-of-court statements to police were inconsistent with his trial testimony, they were independently admissible as substantive evidence under NRS 51.035(2)(a), the statutory exception to the hearsay rule which permits the introduction of prior inconsistent statements made by a testifying witness.[2] *See also* Levi v. State, 95 Nev. 746, 748-49, 602 P.2d 189 (1979). Accordingly, the district court should have admitted any transcribed statements made by Fernando that were inconsistent with his trial testimony.

We conclude, however, that Miranda was not prejudiced by this error. The prior inconsistent statements given by Fernando Cabrera would not have served to exculpate Miranda. Instead, the inconsistencies in question pertained primarily to the sequence of events surrounding the commission of the offense; at best, Miranda might have used the inconsistent statements to impeach Fernando's overall credibility as a witness. Miranda, however, was given a full opportunity to accomplish this at his trial, when the district court permitted him to extensively cross-examine Fernando concerning his prior inconsistent statements. Accordingly, since the jury was made fully aware of the inconsistencies in question and since Miranda was given a sufficient opportunity to impeach Fernando's credibility in this regard, we conclude that Miranda was not prejudiced by the district court's decision not to admit the actual transcribed statements.

We have reviewed Miranda's remaining contentions concerning the guilt phase of his trial and conclude that they are without merit. Accordingly, we now turn to consider Miranda's challenges to the penalty phase of his trial.

## THE PENALTY PHASE

At the penalty phase of Miranda's trial, the state argued the existence of only one aggravating circumstance in its attempt to persuade the jury to impose the death sentence. *See* NRS 200.030(4).[3] Specifically, the state argued that the murder had

---

[2]NRS 51.035(2)(a) provides that:

"Hearsay" means a statement offered in evidence to prove the truth of the matter asserted unless:

. . .

2. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(a) inconsistent with his testimony. . . .

[3]NRS 200.030(4) provides:

Every person convicted of murder in the first degree shall be punished:

been committed during the course of a robbery. *See* NRS 200.033(4).[4] The district court subsequently instructed the jury on this aggravating circumstance, and the jury returned a special verdict form indicating that it had found the one aggravating circumstance to exist.

Miranda contends that the district court erred by permitting the jury to use the fact of the robbery as an aggravating circumstance for two reasons. First, Miranda contends that the state failed to present sufficient evidence that the murder was actually committed during the course of the robbery. Miranda argues that all of the evidence presented at trial indicated that he went to the victim's home for the sole purpose of consummating a drug transaction, and that the murder occurred when the drug transaction failed. Miranda contends that the evidence clearly established that he formulated the intent to rob the victim only after the murder had already been completed. Miranda therefore reasons that the murder did not occur in the course of the robbery itself and that the state should not have been permitted to use the existence of the robbery as an aggravating circumstance. We disagree.

The prosecution is not required to present direct evidence of a defendant's state of mind as it existed during the commission of a crime, and the jury may infer the existence of a particular state of mind from the circumstances disclosed by the evidence. *See* Larsen v. State, 86 Nev. 451, 470 P.2d 417 (1970). The only direct evidence presented at Miranda's trial concerning his intent was Miranda's own statements to Fernando Cabrera and David Cabrera indicating that he went to the victim's home for the purpose of consummating a "drug deal" and that he had somehow been "tricked" during the transaction. These statements, however, were self-serving in nature and the jury was free to disregard them. *See* White v. State, 95 Nev. 881, 603 P.2d 1063 (1979) (credibility of a witness's testimony is within the exclusive province of the jury).

The circumstantial evidence presented at Miranda's trial fully

---

(a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.

[4]NRS 200.033 provides in part that:

The only circumstances by which murder of the first degree may be aggravated are:

. . .

4. The murder was committed while the person was engaged, alone or with others, in the commission of or an attempt to commit . . . any robbery. . . .

supported a conclusion that Miranda had gone to the victim's home intending to rob him and that the murder had occurred during the course of the robbery. Specifically, the jury could have concluded that Miranda had gone to the victim's home with a pair of gloves with the intent to avoid leaving fingerprints behind when he searched the victim's home for valuables. Further, the jury could have inferred from the fact that Fernando Cabrera actually found Miranda in the home searching for valuables, that Miranda had gone to the victim's home to rob him and that the murder had occurred during the course of the robbery. Accordingly, sufficient evidence existed for the state's use of this aggravating circumstance.[5]

Miranda alternatively contends that the state nevertheless should not have been permitted to use the existence of the robbery as an aggravating circumstance, because the robbery had been used as the underlying felony in the guilt phase of his trial to obtain his first degree murder conviction under a felony-murder theory of guilt. As we recently held in Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), however, under Nevada law, the underlying felony in a felony-murder case does not merge with the murder conviction, and it is therefore permissible for the state to use the underlying felony as an aggravating circumstance in the penalty phase of the defendant's trial.

Although we conclude that the district court did not err in permitting the jury to consider this aggravating circumstance, we must still consider whether the jury improperly imposed the death sentence under the influence of passion, prejudice, or any other arbitrary factor. See generally Furman v. Georgia, 408 U.S. 238 (1972); Ybarra v. State, 100 Nev. 167, 679 P.2d 797 (1984); NRS 177.055(2). In this regard, Miranda primarily argues that the jury's sentencing deliberations were tainted by two improper comments made by the prosecutor during the prosecutor's closing arguments at the penalty phase of Miranda's trial.

Miranda first contends that he was prejudiced by the prosecutor's reference to his nationality and mode of entry into this country.[6] Second, Miranda argues that the prosecutor committed

---

[5]For similar reasons, we have rejected Miranda's contention that the evidence presented during the guilt phase of his trial was not sufficient to support the jury's finding of guilt on the robbery count.

[6]During voir dire of a venireman, defense counsel noted that Miranda was a Cuban who didn't speak English. Moreover, he referred to the substantial unfavorable publicity about the immigration of Cubans into America and stated he was sure the venireman had heard some "bad things" and hopefully

misconduct by referring to Richard Nixon's pardon, thereby seeking to inflame the passions and prejudices of the jury on the issue of executive clemency.[7] In neither instance did defense counsel interpose any objection to the prosecutor's remarks. While we do not condone the prosecutor's comments or view them as model trial conduct, we are unpersuaded that the comments rose to the level of plain error mandating a new penalty hearing.

Citing United States v. Frady, 456 U.S. 152, 163 n. 14 (1982), the U.S. Supreme Court in United States v. Young, 470 U.S. ......, 105 S.Ct. 1038, 1047 (1985), declared that "the plain error exception to the contemporaneous objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " Moreover, the *Young* court said that "[r]eviewing courts are not to use the plain error doctrine to consider trial court errors not meriting appellate review absent timely objection—a practice which we have criticized as 'extravagant protection.' " *Id.*, 105 S.Ct. at 1047 (citation and footnote omitted).

Turning first to the prosecutor's reference to Miranda having come to this country in a "flotilla," it may be argued fairly that defense counsel opened the subject during voir dire, and in fact voiced to the venireman, who was retained as a juror, his hope that the venireman had heard some "good things" as well as the

---

some "good things" on the subject. He then concluded by asking the question: "Do you think because he is a Cuban that he is any more likely to have committed a crime than you or I?" The response, of course, was in the negative. During the prosecutor's closing argument, he said, without objection:

> Mr. Rigsby [defense counsel] made a great point during the voir dire of making sure that you would not consider the fact that Roberto Hernandez Miranda is Cuban in your deliberations—and I don't think you should—but only from an objective point of view, that being that he came over here on a flotilla, and he hasn't been here too long, and in the short time that he has been here, he has amassed two convictions—ours and the burglary. That is all we know of Roberto Miranda's life. He certainly has a significant criminal history for the length of time he has been here.

[7]The record reflects the following remarks by the prosecutor after reading the jury instruction concerning executive clemency:

> Everybody knows that people can be pardoned—look at Richard Nixon—but not just by the governor, it also includes actions by the State Board of Pardons in commuting or reducing a defendant's punishment of life without the possibility of parole.
>
> There is a department that considers these things. That department is the State Board of Pardons.
>
> So I caution you not to shy away from something that you feel you should do simply because you feel that the defendant can be taken off the streets for the rest of his natural life. That may or may not be the case.

bad concerning the migration of Cubans to this country. The prosecutor did not expressly cast the equivocal noun "flotilla" in an unfavorable light, but instead emphasized the degree of Miranda's criminal activity during his brief period of residence in this country. Absent a trial objection by defense counsel, we do not consider the context of the prosecutor's remark to be prejudicial to the jury's deliberations.

In considering the prosecutor's conduct in approaching the subject of executive clemency, we note that Miranda's trial occurred prior to our decision in Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985). We therefore view this issue from the more broad perspective of California v. Ramos, 463 U.S. 992 (1983), rather than the narrower constraints of *Petrocelli*. Under either case, however, a jury may be instructed on the possibility of executive clemency without offending constitutional or statutory principles. We expect, however, that the prospective standard enunciated in *Petrocelli* will eliminate prosecutorial comments of the type presented here. Under *Petrocelli,* a jury may be given the executive clemency instruction authorized by that decision and none other. The latter instruction directs the jury not to speculate as to whether a sentence once given may later be changed by operation of the processes of executive clemency. In the instant case, the prosecutor sought to focus the jury's attention on Miranda's prospects for executive clemency by referring to the presidential pardon accorded Richard Nixon. While disapproving of the prosecutor's attempt to thus influence the jury, we do not view the remark to be of sufficient gravity to warrant review under the category of plain error. Defense counsel was not provoked to the point of objecting to the comment and indeed, may have concluded that reference to the nonviolent behavior involved in Nixon's pardon would provide the jury with no impetus for imposing the ultimate sentence on Miranda's crime of violence and murder. Again, the *Young* court, quoting with approval from a concurring opinion in Johnson v. United States, 318 U.S. 189, 202 (1943) observed that:

> In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution. United States v. Young, *supra,* 105 S.Ct. at 1047.

In reviewing the record before us, we cannot perceive a fundamental lack of fairness or a miscarriage of justice emanating from

the foregoing prosecutorial improprieties. Viewed from the vantage point of the entire proceeding, Miranda was fairly tried.

Miranda's position concerning the failure of the district court to submit a special verdict form to the jury is without merit. We have previously held that the absence of such a form, without more, does not constitute reversible error. *See* Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985).

## PROPORTIONALITY REVIEW

Finally, we have reviewed Miranda's death sentence as required by NRS 177.055(2)(d) to determine whether Miranda's death sentence is "disproportionate to the penalty imposed in similar cases in this state, considering both the crime and the defendant." We conclude that it is not disproportionate.

The facts elicited at trial reveal that Miranda violently stabbed his victim and thereafter, wearing gloves, went about taking the victim's property. Considering the circumstances of Miranda's crime and the lack of any mitigating factor upon which a determination of disproportionality might be based, we conclude that the sentence of death was fairly imposed. *See* Wilson v. State, 101 Nev. 452, 705 P.2d 151 (1985); Snow v. State, 101 Nev. 439, 705 P.2d 632 (1985); Farmer v. State, 101 Nev. 419, 705 P.2d 149 (1985); McKenna v. State, 101 Nev. 338, 705 P.2d 614 (1985).

We further conclude that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor, as revealed by the record. Accordingly, the sentence of death is affirmed.[8]

SPRINGER, C. J., and MOWBRAY and GUNDERSON, JJ., concur.

ZENOFF, Sr. J., dissenting:

I respectfully dissent.

I find the statement of facts and conclusions of law by the other members of the court acceptable with regard to the guilt phase and some factors of the penalty phase. However, I do not at all agree that the remarks of the prosecutor were not prejudicial even though "we wish they hadn't been said."

We have always realized that to a jury the influence of the government, as represented by the prosecutor, is existent. It is

---

[8]The Governor designated THE HONORABLE DAVID ZENOFF, Senior Justice, to participate in the decision of this matter pursuant to Nev. Const., art. 6, § 4. THE HONORABLE JUSTICE CLIFF YOUNG did not participate in the disposition of this appeal.

seldom possible, however, to measure its strength, and it would not be unfair to say that many people adopt the position that if the government says it is so, it must be true.

In a case such as this, we cannot assess the degree of that influence with any real accuracy. One can only surmise that the prosecutor's references to the unpopular pardon of Richard Nixon, and the tremendously unpopular influx of Cubans at the particular time, were reflected in the prosecutor's presentation so that the buttering of his words was lost by his tone of voice.

No trial can be perfect, but with a life at stake it would seem that a reduction of the penalty by this court to life in prison without possibility of parole would be more appropriate.