*1125 OPINION
By the Court,
Shearing, J.:
On January 16, 1994, the nude body of twenty-year-old Ebony Mason was discovered twenty-five feet from the road in an unimproved desert area of Clark County. The woman’s body was found lying face down with hands extended overhead to a point on the ground where it appeared that some digging had occurred. A four-inch twig protruded from the victim’s rectum. Three distinct types of footwear impressions were observed in the area as well as a hole containing a broken condom, a condom tip and an open but empty condom package.
In the opinion of the medical examiner, Mason died from asphyxia due to strangulation and/or from blunt trauma to the head. The autopsy revealed nine broken ribs, multiple areas of external bruising, contusions, lacerations, abrasions, and a ligature mark on the anterior surface of the neck. Mason’s body also bore a number of patterned contusions consistent with footwear impressions on the skin of the back and chest. Finally, the autopsy revealed severe lacerations of the head and underlying hemorrhage within the skull indicating a blunt force trauma.
A police investigation led to the arrest of appellant Sterling Mark Atkins, Jr. (“Atkins”) and Anthony Doyle in Las Vegas, Nevada. Atkins’ brother, Shawn Atkins (“Shawn”), was also arrested, but his arrest took place in Ohio by agents of the Federal Bureau of Investigation (“FBI”). Upon his arrest, Shawn gave a voluntary statement to the FBI regarding the events leading up to Mason’s death on January 15, 1994. Shawn stated that after returning to Atkins’ apartment from a party that night, he, Atkins, and Doyle encountered Ebony Mason, a mutual acquaintance, who was intoxicated and/or high on drugs. Mason agreed to accompany the men to Doyle’s apartment to have sex with them. According to Shawn, Mason had consensual sex with Atkins and oral sex with Shawn, but she refused Doyle when he attempted to have anal sex with her. After these activities, Doyle agreed to drive Mason to downtown Las Vegas. Doyle drove a pick-up truck with Shawn, Atkins and Mason accompanying him, but instead of driving downtown, Doyle drove to a remote area in Clark County. Doyle was angry with Mason and demanded that she walk home. When she refused, Doyle stripped her clothes off *1126 and raped her as Shawn and Atkins watched, and then both Atkins and Doyle beat and kicked her until she died.
The State charged Doyle, Atkins and Shawn with one count each of murder, conspiracy to commit murder, robbery, first degree kidnapping and sexual assault. The State also filed a notice of intent to seek the death penalty. Thereafter, the district court granted Doyle’s motion to sever trials and dismissed the robbery count against all three men. At a separate trial, commencing January 3, 1995, Doyle was convicted on all counts and sentenced to death for the murder. See Doyle v. State, 112 Nev. 879, 921 P.2d 901 (1996).
On February 13, 1995, prior to trial, Shawn entered into a plea bargain agreement wherein he pleaded guilty to first-degree murder and first-degree kidnapping and was sentenced to two concurrent life sentences with the possibility of parole. As part of the bargain, Shawn agreed to testify at Atkins’ trial.
On March 20, 1995, Atkins’ jury trial commenced. As the State’s only eyewitness, Shawn testified that Atkins was not involved in Mason’s beating and murder, but the State impeached Shawn with his prior inconsistent statements to the FBI and to witness Mark Wattley. At the conclusion of the guilt phase of the trial on March 30, 1995, the jury found Atkins guilty of murder, conspiracy to commit murder, first-degree kidnapping and sexual assault. At the conclusion of the penalty phase, the jury sentenced Atkins to death for the murder conviction.
Atkins first claims that there is insufficient evidence to support his conviction for sexual assault based upon the four-inch twig found inserted in Ebony Mason’s rectum. Atkins contends that the crime of sexual assault requires a live victim. He asserts that there was no evidence adduced at trial regarding whether the twig was placed pre-mortem, peri-mortem, or post-mortem.
In Doyle, this court faced the identical issue in co-defendant Anthony Doyle’s case. NRS 200.366(1) defines sexual assault, but does not indicate whether the victim must be alive.[1] After *1127 reviewing the language of the statute and the law in other jurisdictions with similar statutes which have dealt with this question, this court held that Nevada’s sexual assault statute requires a live victim. “Although Nevada’s sexual assault statute provides little guidance . . ., we conclude that the better reasoned interpretation is that the legislature intended ‘person’ in the rape statute to mean a living human being.” Id. at 899, 921 P.2d at 914. In light of Nevada’s necrophilia statute, this court reasoned that the Nevada legislature recognized the distinction between sexual assault perpetrated on a corpse as opposed to a live human being. Id. Accordingly, Atkins’ conviction for sexual assault can only stand if sufficient evidence was adduced at trial to establish that Mason was alive at the time the twig was inserted into her rectum.
Mason was found dead, unclothed, and with the twig protruding from her rectum. The medical examiner’s testimony failed to establish whether Mason was alive or dead at the time the twig was inserted into her rectum. The autopsy revealed no evidence of contusion, laceration, or other trauma associated with Mason’s rectum, evidence which would have supported the position that she was alive at the time of the penetration. Shawn’s testimony also provides no guidance. He asserted that he did not view any of the events associated with the twig. It appears that Mason was killed, dragged into the bushes, and then penetrated with the twig. In any event, there was insufficient evidence to conclude that the penetration occurred prior to Mason’s death and therefore, Atkins’ conviction for sexual assault must be reversed.
Atkins also contends that the district court erred in allowing the State to introduce prior inconsistent statements Shawn had made to FBI Agent Larkin upon Shawn’s arrest.
Trial courts have considerable discretion in determining the relevance and admissibility of evidence. Sterling v. State, 108 Nev. 391, 395, 834 P.2d 400, 403 (1992). An appellate court should not disturb the trial court’s ruling absent a clear abuse of that discretion. Lucas v. State, 96 Nev. 428, 431-32, 610 P.2d 727, 730 (1980).
There are three separate excerpts from Shawn’s testimony to which Atkins attributes error. We consider each in turn. First, during Shawn’s direct examination, the following exchange occurred:
Q: Let me draw your attention, Shawn, to February 25th, 1994. Do you recall being arrested in Cleveland, Ohio by the representatives of the Federal Bureau of Investigation, the FBI?
A: Yes.
*1128 Q: And after you were arrested by FBI agents, do you recall giving them a voluntary statement concerning what had taken place on the evening of January 15, 1994, in connection with Ebony Mason’s death?
A: Yes.
Q: And in fact am I correct in stating that you drew them a little map, a little diagram of the area, where you thought the killing had occurred?
A: Yes.
Q: And as you spoke with FBI agents, they were taking notes. Is that correct?
A: Yes.
Q: Did they ask you to initial certain pages at the conclusion of the statement?
A: Yes.
Q: [Were] you truthful when you gave that statement to the FBI?
A: Yes.
Although Atkins cites to this testimony in his opening brief as impermissible, he fails to support his argument with any relevant authority. After review, we conclude that there is nothing objectionable about this line of questioning.
Second, during Shawn’s redirect examination, the following sequence of questions and answers occurred:
Q: Now you told Defense Counsel that you don’t remember Ebony saying anything with regards to a phone call. Do you recall telling the FBI that, “Ebony got outside the apartment, she was going to a telephone to report her rape to the police.” However, your brother, the Defendant (who you may refer to as Bubba) “. . . talked her out of it, and Bubba and Ebony got back into the truck and snuggled up?”
A: Yes. But that’s not how it was coming down.
Q: Did you say that to the FBI?
A: Yes, I did.
Q: Do you recall telling the FBI that Tony Doyle and your brother Bubba then began beating and kicking Ebony?
A: Yes.
Q: Do you recall telling the FBI that you told Bubba and Tony Doyle, “This shit’s fucked up?” (Excuse my language.)
A: Yes.
Q: Do you recall telling the FBI that, “He did not watch what Bubba and Tony Doyle were doing while he . . meaning yourself — “was in the truck? And at some point Bubba and Tony Doyle got back into the truck, turned on the radio and drove back to Las Vegas.”
A: Yes.
*1129 Atkins asserts that because Shawn agreed to the prosecutor’s questions, his testimony was consistent with what he had previously told the FBI agents. Therefore, according to Atkins, this testimony does not fall under the prior inconsistent statement exception to the hearsay rule and it was improperly admitted.
Our review demonstrates that the above-referenced testimony involved both prior consistent and prior inconsistent statements. The prosecutor’s questions themselves contained the prior statements. On direct testimony, Shawn did not testify that Ebony left the apartment in order to report a rape to the police, yet he made that assertion to the FBI in his prior voluntary statement. In addition, Shawn stated on direct examination that he did not know if his brother, Atkins (Bubba), did anything more than tap Ebony Mason with his foot to see if she was still conscious. Yet, Shawn told the FBI that he saw his brother beating and kicking Ebony Mason. Finally, Shawn did not assert on direct examination that he cursed Atkins and Doyle before he got back into the truck, yet he told the FBI that he did.
We conclude that these statements qualify as prior inconsistent statements that were properly admitted under NRS 51.035(2)(a). This statute sets forth the prior inconsistent statement exception to the hearsay rule. It allows the admission of an out-of-court statement that would otherwise be considered inadmissible hearsay when “[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is inconsistent with his testimony.” NRS 51.035(2)(a). Here, Shawn testified at trial, these out-of-court statments are inconsistent with his trial testimony, he was confronted with these statements at trial and he was cross-examined regarding them. See Hardison v. State, 104 Nev. 530, 533, 763 P.2d 52, 55 (1988). We note that prior inconsistent statements under NRS 51.035(2) (a) may be admissible for both substantive and impeachment purposes. Miranda v. State, 101 Nev. 562, 567, 707 P.2d 1121, 1124 (1985).
Shawn’s other prior statements to the FBI, that Shawn did not view what happened after he got into the truck and that they all drove back to Las Vegas, are consistent with his direct testimony. These prior consistent statements are hearsay and they do not fall within any exception to the hearsay rule, and therefore, their admission was error. However, we conclude that their admission was harmless error. See NRCP 61.
Third, on direct examination, Shawn stated that his brother did nothing more than tap Ebony Mason with his foot to see if she was conscious. The prosecutor then introduced Shawn’s prior inconsistent statement to the FBI:
*1130 Q: Do you recall telling a member of the FBI that you saw your brother start to kick Ebony Mason along with Tony Doyle and you started screaming for them, T-H-E-M, the two of them?
A: When I started screaming, I was screaming at Anthony Doyle.
Q: Do you recall telling a member of the FBI that you were screaming at them for what they were doing to Ebony Mason?
A: I don’t know exactly that I . . .
Q: Do you recall saying that to an FBI agent in Cleveland, Ohio?
A: I don’t know if that’s exactly what I said. I might have though.
Atkins contends that because Shawn did not agree to or deny making these statements to the FBI, the admission of these statements was error.
Here, Shawn denied that he yelled at his brother, Atkins, to stop beating Ebony Mason. Yet, he told the FBI that he had yelled at “them,” Atkins and Doyle, to stop beating the victim. We conclude that Shawn’s prior inconsistent statements were admissible under NRS 51.035(2)(a).
Atkins further argues that “the State’s primary purpose in calling Shawn Atkins to the stand was to get him to say things diiferently then [sic] what he said to the FBI agents, and then offer substantive evidence to the jury via the testimony of Agent Larkin, all in the guise of impeachment evidence.” This contention is without merit. The State called Shawn to testify as the only eyewitness to the crime. Moreover, pursuant to a plea bargain agreement, Shawn agreed to “fully and honestly” testify in the present case. Shawn also signed an “Agreement to Testify,” wherein he agreed to voluntarily cooperate with the State in the investigation and prosecution of the instant case. There was no “subterfuge,” as Atkins asserts, and the State was completely justified in calling Shawn to the witness stand and expecting him to testify truthfully regarding Atkins’ involvement in the murder.
Atkins also contends that the district court erred in allowing the State to introduce extrinsic evidence of a prior inconsistent statement made by Shawn to witness Mark Wattley.
At trial, Shawn’s testimony minimized his brother’s involvment in Mason’s murder, stating that he only saw Atkins “tap” or “kick” her with his foot to see if she was still conscious. *1131 During Shawn’s direct examination, the following exchange occurred:
Q: Prior to [getting into the truck], what did you see your brother do to Ebony Mason?
A: I think he kicked her with his foot to see if she was conscious, if she was awake. She was still.
Q: Now, is it your testimony that your brother, the Defendant, went over to Ebony Mason. And just to see if she was conscious, just tapped her a little with his foot?
A: Ah, I think it was more aggressive than that, but I don’t — I don’t ....
At the time Shawn was on the stand, the State did not confront him with a prior inconsistent statement to Mark Wattley. Yet, the State thereafter called Mark Wattley as a witness and he testified that Shawn had told him during a previous conversation that he (Shawn) had seen his brother beating, kicking, stomping and choking Ebony Mason. Mark Wattley testified as follows:
Q: As best you can remember at this point in time, Mark, would you explain what you recall [about] that conversation that you had with Shawn?
A: It was basically about when Tony [Doyle] - - how he jumped it off, and how Bubba [Atkins] and Tony had kind of started whooping on her. And that after . . .
Q: No, — I’m sorry?
A: And then after that, it was like, you know, he told me that just him and Tony went crazy. Bubba [Atkins] and Tony went crazy, and they hit her in the head with a rock, stomped her, choked her with her pants leg.
Q: And did he say specifically what Tony did?
A: Well, after that — I guess, after they got through kicking her, he said Bubba [Atkins] tried to choke her with a pants leg around her, you know, neck, and then that’s when Tony hit her in the head with a rock.
Q: When you talked to Shawn about this murder and he described what happened, did he tell you how Ebony Mason died?
A: Yeah. A brain concussion.
On direct, Shawn stated that his brother “tapped” and “kicked” Mason. Yet, Shawn had told Mark Wattley that his brother had “kicked,” “stomped on” “whooped” and “choked” Ebony Mason. We conclude Mark Wattley’s testimony regarding Shawn’s prior inconsistent statements was admissible pursuant to NRS 50.135(2)(b). NRS 50.135(2)(b) states:
*1132 2. Extrinsic evidence of a prior contradictory statement by a witness is inadmissible unless:
(b) The witness is afforded an opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate him thereon.
This statute differs from NRS 51.035(2) (a) in that it relaxes the requirement that the witness be confronted with the prior inconsistent statement during direct or cross-examination.[2] Rather, extrinsic evidence of a prior inconsistent statement may be introduced and the witness may thereafter address it. Although the witness need not be confronted with the statement at the time of his examination, the statute makes clear that there should be some opportunity, at some point in the trial, for the witness to explain, repudiate or deny the statement.[3]
Here, Shawn was never recalled to the stand to explain or deny his prior inconsistent statements to Mark Wattley and the defense did not interrogate Shawn thereon. Thus, the statute’s requirements were not met. Nevertheless, we conclude that under the limited facts of this case, the failure to confront Shawn with these prior inconsistent statements was harmless error. Our review of the trial transcript reveals that the defense thoroughly cross-examined Shawn regarding the extent of his brother’s involvement in the murder.[4]
*1133 Atkins next asserts that the district court erred in admitting evidence relating to the previous death of Ebony Mason's child because it was irrelevant and more prejudicial than probative.
Trial courts have considerable discretion in determining the relevance and admissibility of evidence. Sterling, 108 Nev. at 395, 834 P.2d at 403. An appellate court should not disturb the trial court's ruling absent a clear abuse of that discretion. Lucas, 96 Nev. at 431-32, 610 P.2d at 730. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." NRS 48.015. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues or of misleading the jury. NRS 48.035(1).
We conclude that the evidence of Ebony Mason's child's death was relevant because it was offered to respond to disparaging comments regarding Mason's character elicited by the defense. Shawn testified on cross-examination that he believed Mason was either intoxicated or high on drugs the night of the murder. Essentially, the defense put the victim on trial. In response, the State presented testimony from Gary Mason, Ebony Mason's father, that Ebony's child had died in a bathtub drowning six months prior to Mason's death. Gary Mason further stated that as a result of the death, Ebony suffered "from major depression and a post-traumatic stress syndrome." Gary Mason described Ebony Mason's depression and her use of illegal drugs as a result of that tragedy.
We conclude that the evidence of Ebony Mason's child's death and her consequent depression are relevant to explain the defense's characterization of her as a "hood rat" and substance abuser. Whether this evidence was more probative than prejudicial should be left to the sound discretion of the trial court. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985). *1134 We conclude that the district court’s admission of this evidence was not an abuse of its discretion.
Atkins next argues that the aggravating circumstance enunciated in NRS 200.033(4) is unconstitutional. He asserts that the statute does not genuinely narrow the class of persons eligible for the death penalty. To support his position, Atkins relies upon State v. Cherry, 257 S.E.2d 551 (N.C. 1979), and State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). We conclude that Atkins’ contention lacks merit.
NRS 200.033(4) states that murder in the first degree may be aggravated if:
The murder was committed while the person was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery, sexual assault, arson in the first degree, burglary, invasion of the home or kidnapping in the first degree, and the person charged:
(a) Killed or attempted to kill the person murdered; or
(b) Knew or had reason to know that life would be taken or lethal force used.
In Petrocelli v. State, 101 Nev. 46, 692 P.2d 503, (1985), this court determined that NRS 200.033(4) is constitutional. This court specifically rejected the merger rule espoused in Cherry, that “the underlying felony becomes an element of the crime of felony murder and may not act as the basis for additional prosecution or sentence.” Id. at 53, 692 P.2d at 509. This court stated:
We, contrarily, do not adhere to the merger rule. See Brimmage v. State, 93 Nev. 434, 567 P.2d 54 (1977). Because a defendant in our jurisdication can be convicted and sentenced for both robbery and felony murder, we decline to follow . . . the reasoning set forth in Cherry. . . . [W]e note that the U.S. Supreme Court has implicitly approved the use of the underlying felony in felony murder cases as a valid aggravating circumstance to support the imposition of the death sentence. See Proffitt v. Florida, 428 U.S. 242 (1976); Gregg v. Georgia, 428 U.S. 153 (1976).
Id.; accord Miranda v. State, 101 Nev. 562, 707 P.2d 1121 (1985), cert. denied, 475 U.S. 1031 (1986); Farmer v. State, 101 Nev. 419, 705 P.2d 149 (1985), cert. denied, 476 U.S. 1130 (1986). Further, our review of Middlebrooks, the case upon which Atkins heavily relies, simply demonstrates that the Tennessee Supreme Court has chosen to adopt Cherry and the merger rule. Middlebrooks, 840 S.W.2d at 341-42. We still decline to embrace Cherry.
*1135 Atkins also contends that the prosecutor’s comments during closing argument of the penalty phase amount to prosecutorial misconduct.
“[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor’s comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor’s conduct affected the fairness of the trial.” United States v. Young, 470 U.S. 1, 11 (1985). In addition, should this court determine that improper comments were made by the prosecutor, “it must be determined whether the errors were harmless beyond a reasonable doubt.” Witherow v. State, 104 Nev. 721, 724, 765 P.2d 1153, 1155 (1988). It is not enough that the prosecutor’s remarks are undesirable. Darden v. Wainwright, 477 U.S. 168, 181 (1986). The Constitution guarantees a fair trial, not necessarily a perfect trial. Ross v. State, 106 Nev. 924, 927, 803 P.2d 1104 (1990). Thus, the relevant inquiry is whether the prosecutor’s statements so infected the proceedings with unfairness as to make the results a denial of due process. Darden, 477 U.S. at 181.
Atkins contends that during closing argument of the penalty phase, the prosecutor inflamed the passion of the jury with the following remarks:
Consider this in contrast to Ebony Mason. She will never see her children again or hear their laughter. She will never experience the joy of watching her children grow up, get an education, get married, have children of their own. She will never again be able to watch the sunrise or the sunset. [Objection overruled.]
She will never again listen to music or read a book. She will never again see her mother, her father, her grandmother, her brother, or her sister and, of course, her children. Ebony Mason’s parents can visit Ebony Mason, but they have to go to the cemetery to visit their young child. [Court: “Counsel, the last part, I will strike that. The jury is admonished to disregard the last statement.]
While prison life within those walls might not be easy, within those walls, there is life, and where there is life, there is hope. What would Ebony Mason give to be in a situation where she could see her parents? [Objection overruled.] What would Ebony Mason give to be in a situation where she could hug her children, where she could see the sunrise and sunset. What would Ebony Mason give just to be alive?
The Defendant has already stabbed someone in the back, *1136 brutally murdered a young woman within a span of about two years. Where does he go from here? What does he do for an encore? [Objection sustained.]
The shorter the sentence, the sooner this community will find out. [Objection sustained.]
This wasn’t just a bullet in the head. Hit over the head; she’s knocked out; she dies. She was savaged for a period, a significant period of time, by a group of individuals. How many times during this period of time as she was clawing, trying to get up, trying to fight off her attackers, dragged across the ground, beaten, stomped, how many times did Ebony think, “This is it? I’m dead; this is it.” [Objection overruled.]
We conclude that the aforementioned closing arguments by the prosecutor during the penalty phase were proper as they described the impact of the crime on the victim and her family. Payne v. Tennessee, 501 U.S. 808 (1991). In Homick v. State, 108 Nev. 127, 825 P.2d 600 (1992), this court “applaud[ed] the decision in Payne as a positive contribution to capital sentencing, and concluded] that it fully comports with the intendment of the Nevada Constitution.” Id. at 136, 825 P.2d at 606. This court reasoned:
The key to criminal sentencing in capital cases is the ability of the sentencer to focus upon and consider both the individual characteristics of the defendant and the nature and impact of the crime he committed. Only then can the senten-cer truly weigh the evidence before it and determine a defendant’s just desserts. Apropos to the point is the statement by the venerable Justice Cardozo in Snyder v. Massachusetts, 291 U.S. 97, 122 (1934), that “justice, though due to the accused is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.”
Id. at 137, 825 P.2d at 606. The contested arguments related specifically to the impact of the crime on Ebony Mason and her family. They described to the jury the nature and the impact of the crime committed. We conclude that they do not constitute prosecutorial misconduct.
Atkins further contends that the prosecutor committed misconduct by impermissibly arguing that the jury should return a verdict of death in order to please the jury members’ friends and neighbors. He cites Collier v. State, 101 Nev. 473, 705 P.2d 1126 (1985), in support of his position. In Collier, this court disap *1137 proved of a prosecutor’s statement to the jury that it must be angry with the defendant or else “we are not a moral community.” Id. at 479, 705 P.2d at 1129-30. This court found this comment, among others, to be a blatant attempt to inflame the jury and an inappropriate encouragement to approach their duties with anger. Id. This court rejected the State’s contention that general comments about community standards are proper. Id.
In the instant case, the prosecutor stated the following during closing argument:
You can feel good about a verdict of death. You can hold your head up high when you walk out of this building. If asked what you did down at the courthouse in the case, State v. Sterling Atkins, you can respond by saying you heard evidence about a man who kidnapped and sexually assaulted a young mother of two, a man who participated in the shoving of a stick into the rectum of that poor young woman, a man who left foot impressions on her body, a man who did all this while on parole for yet another violent felony that he committed.
If asked what you did on that case you can respond by saying you found the Defendant guilty of first degree murder and you sentenced him to death. That’s what you did down at the courthouse in the case of State v. Sterling Atkins. You can reply by saying you did justice in that case.
We conclude that the prosecutor’s comments in the instant case do not rise to the level of those in Collier. Rather, the prosecution sought to persuade the jury to do justice in this particular case. Accordingly, we conclude that there was no prosecutorial misconduct.
In cases in which the death penalty is imposed, this court is also statutorily required to consider whether the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor and whether the sentence of death is excessive considering both the crime and the defendant. NRS 177.055(2). We conclude that the death sentence was not imposed under the influence of passion, prejudice or any arbitrary factor, nor was it excessive in this case considering the senseless and violent nature of the crime.
In conclusion, we reverse the judgment of conviction for sexual assault. We affirm the judgement of conviction for first-degree murder, conspiracy to commit murder, and first-degree kidnapping and the sentence of death.
Young and Springer, JJ., concur.

NRS 200.366(1) defines sexual assault as follows:
A person who subjects another to sexual penetration, or who forces another person to make a sexual penetration on himself or another, or on a beast, against the victim’s will or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault.
“Sexual penetration” includes: “any intrusion, however slight, of any part of a person’s body or any object manipulated or inserted by a person into the . . . anal opening of the body of another.” NRS 200.364(2).
Under this definition, the act of inserting a four-inch twig into Ebony Mason’s rectum constitutes sexual penetration for the purposes of sexual assault.

NRS 51.035(2)(a) is very similar to NRS 50.135(2)(b). NRS 51.035(2)(a) prohibits the admission of hearsay evidence unless “the declar-ant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is inconsistent with his testimony.”
NRS 51.035(2)(a) embodies the traditional approach to the admission of prior inconsistent statements. It addresses the situation where the witness is confronted with the statement at the time of his examination thereby giving him an opportunity to admit or deny making the prior inconsistent statement at that very moment.

We note that NRS 50.135(2)(b) is the Nevada counterpart to Federal Rule of Evidence 613(b). Rule 613(b) states in relevant part:
Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.
See also 2 Stephen A. Salzburg et al., Federal Rules of Evidence Manual, 985-1002 (6th ed. 1994).

During Shawn’s cross-examination, the following exchange occurred:
Q: Isn’t it true you saw Sterling kick Ebony once?
A: Yes.
Q: And while it wasn’t an attack like the District Attorney [said], it wasn’t like that, it wasn’t a full cocked kick either, was it?
A: No, it wasn’t like Anthony Doyle was kicking her, no.
*1133 Q: It wasn't that he was trying to harm her, was it?
A: No.
Q: That's all you saw your brother do. Isn't that right?
A: Yes.
Q: You saw Tony Doyle do a lot more?
A: Ah, I saw him beating her, yeah.
Q: You didn't see Sterling strangle Ebony Mason, did you?
A: No, I did not. No.
Q: You didn't see Sterling smash a brick in Ebony's head, did you?
A: No, I did not.